UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


YVONNE RYAN,

          Plaintiff,                 CIVIL ACTION NO. 08-13453

        v.                      DISTRICT JUDGE SEAN F. COX

COMMISSIONER OF              MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

          Defendant.
_____/


**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**


I.     **PROCEDURAL HISTORY**

     *A.    Proceedings in this Court*

     On August 8, 2008, Plaintiff filed the instant suit seeking judicial review of the

Commissioner's decision disallowing benefits (Dkt. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B)

and Local Rule 72.1(b)(3), this matter was referred to the undersigned to review the

Commissioner's decision denying Plaintiff's claim for a period of disability and Disability

Insurance Benefits (DIB) under Title II of the Social Security Act (Dkt. 3). This matter is

currently before the Court on cross-motions for summary judgment (Dkt.12, 15).

     In light of the entire record in this case, I suggest that substantial evidence supports the

Commissioner's determination that Plaintiff is not disabled. Accordingly, it is

**RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED** and that the findings of the Commissioner be **AFFIRMED**.

### B.    Administrative Proceedings

Plaintiff filed the instant claims on October 23, 2003, alleging that she became unable to work on March 5, 2002 (Tr. at 17).  The claim was initially disapproved by the Commissioner on February 26, 2004 (Tr. at 17).  Plaintiff requested a hearing and on September 27, 2006, Plaintiff appeared with counsel before Administrative Law Judge (ALJ) Charles D. Reite, who considered the case *de novo*.  In a decision dated December 9, 2006, the ALJ found that Plaintiff was not disabled (Tr. at 23).  Plaintiff appealed this determination, but the Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter (Tr. 5-7). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## II.    STATEMENT OF FACTS

### A.    ALJ Findings

Plaintiff was fifty two years of age at the time of the most recent administrative hearing (Tr. at 22).  The ALJ applied the Agency's five-step sequential evaluation process and found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date (step one) (Tr. 19-20).  However, the ALJ also found "anecdotal evidence in the file" that Plaintiff was performing some work related to "taking care of some older ladies" (Tr. 19).  Specifically, the ALJ noted that Plaintiff's earning records showed posted earnings of $3,504.40 (2002),

- 2 -

$4,569.68 (2003), $6,465.28 (2004) and $9,953.59 (2005) from the Department of Community

Health Home.  Furthermore, the ALJ noted that Plaintiff's medical records contained references

to this gainful employment.  Specifically, consulting physician Faith Abbott, D.O. stated on

March 1, 2005 that Plaintiff "provides home care for elderly and is currently employed full time"

(Tr. 301) and treating neurosurgeon E. Malcolm Field, M.D. stated on April 1, 2005 – when

referring to a four to six week post-surgical recovery – that Plaintiff "takes care of some elderly

ladies and I would think that probably by that time she would be able to go back to doing that"

(Tr. 315).  Despite this evidence that Plaintiff was indeed conducting "substantial gainful

activity," the ALJ gave Plaintiff "considerable benefit of the doubt" and allowed Plaintiff to

proceed past step one.  However, the ALJ did consider this work activity as a factor in support of

his determination concerning Plaintiff's residual functional capacity.

  The ALJ next found that Plaintiff had severe impairments of  bilateral carpal tunnel

syndrome (left side worse than right) and mild degenerative disk disease of the cervical spine

(step two), but that these impairments did not meet or equal an impairment listed in Appendix I,

Subpart P, Regulations No. 4 (step three) (Tr. 20).  Despite some medical evidence indicating

Plaintiff suffered from additional afflictions, the ALJ ultimately found that Plaintiff's lumbar

spine, transverse myelitis, status post crantiotomy, obstructive sleep apnea, depression and

fibromyalgia did not rise to the level of "severe impairments" (Tr. 20).  Of note, the ALJ found

that – prior to her retirement from General Motors – Plaintiff received no treatment other than

medication for her depression and that Plaintiff's medical records did not contain any clinical

findings supporting a diagnosis of fibromyalgia (Tr. 20).

The ALJ next found that Plaintiff was not credible to the extent that she alleged total disability and ultimately found that Plaintiff retained the ability to perform a range of light work (Tr. 21-22). Specifically, the ALJ found that Plaintiff was able to perform the exertional requirements of light work, except that she was able to use her bilateral upper extremities on a frequent (as opposed to constant) basis (Tr. 21). Portions of Plaintiff's medical records (in particular the records of Drs. Braun and Awerbuch) disagreed with this level of functionality, however the ALJ gave limited weight to Drs. Braun and Awerbuch's opinions as their opinions were directly contradicted by evidence that Plaintiff was actually working "taking care of elderly women." Furthermore, the ALJ found that Drs. Braun and Awerbuch's opinions were inordinately based on Plaintiff's subjective complaints, which the ALJ found to be not fully credible (Tr. 21). The ALJ explained that he did not find Plaintiff credible in light of Dr. Field's April 2005 notation that Plaintiff could return to her past work of taking care of elderly ladies (following surgical recovery), combined with Plaintiff's failure to acknowledge her employment in her initial disability and appeal forms or during the hearing (Tr. 21).

Based upon a restriction to light work (with "frequent," but not "constant" use of upper extremities), the ALJ next found that Plaintiff was unable to perform her past relevant work as a foundry worker/core assembler for General Motors, which was performed at the medium exertional level (step four) (Tr. 22, 476). However, with the help of a vocational expert, the ALJ identified a significant jobs in the national economy that Plaintiff, who was fifty-two years old at the date of the ALJ's decision with a high school education, remained capable of performing, such as cashier (1.6 million jobs in the national economy) and officer helper (1.5 million jobs in

- 4 -

the national economy) (step five) (Tr. 22-23, 479-80). Thus, the ALJ found that Plaintiff was not

disabled on, or prior to, the date of the his decision (Tr. 23).

### C.    *Administrative Record*

#### 1.    **Plaintiff's Testimony and Statements**

In November 2003, Plaintiff completed a form for the state agency (Tr. 79-86).  Plaintiff

testified that she was able to do her laundry, ironing, and cleaning, but that she needed to rest

after about an hour of activity (Tr. 82).  Plaintiff stated that she drove and was able to shop for

clothes and food (Tr. 82), that she went to church twice a week (Tr. 83) and that she spent her

days reading and watching television (Tr. 83).

Plaintiff reported that it bothered her hands to lift or reach; it bothered her back to stand,

sit, walk, climb, or kneel; and it bothered her neck to reach up (Tr. 84).  Plaintiff noted that she

had no carpal tunnel surgery on her right wrist, which was her dominant hand (Tr. 449). Plaintiff

testified that she never returned to work at General Motors after March 2002 and that, after that

date, she did not perform any work for which she was paid (Tr. 481).

#### 2.    **Relevant Medical Evidence**

In January 2002, Plaintiff saw Gavin I. Awerbuch, M.D., with complaints of back pain

and numbness and tingling in her hands, feet, and legs (Tr. 234). On examination, her range of

neck motion was reduced and she had fourteen tender trigger points (Tr. 235). Her gait was

normal, but she initially stood and walked with a limp (Tr. 235). Dr. Awerbuch's impression

was cumulative trauma syndrome; bilateral carpal tunnel syndrome; fibromyalgia; history of

cervical disc disease; and rule out mitral valve prolapse (Tr. 235). He advised further testing,

limited her home activities, and suggested she remain off work (Tr. 236). In March 2002,

Plaintiff complained of numbness of her feet and legs, especially on the left (Tr. 233). Although

some of her blood work was normal, Dr. Awerbuch was concerned about her cervical MRI scan,

which suggested the possibility of demyelinating disease (Tr. 233). He ordered further testing

and advised her to stay off work (Tr. 233). Plaintiff's March 2002 lumbar spine MRI scan

revealed degenerative disc disease with mild disc herniation but no compression or

impingement on the nerve roots (Tr. 124. 224). Plaintiff's leg EMG was normal (Tr. 217).

In April 2002, Thomas H. Beird, M.D., performed left carpal tunnel release surgery (Tr.

120-23). In May 2002, Dr. Beird diagnosed right carpal tunnel syndrome (Tr. 118-19). In May

2002, Plaintiff returned to Dr. Awerbuch, who noted that further testing confirmed that Plaintiff

did not have a demyelinating disease (Tr. 232). Dr. Awerbuch diagnosed bilateral carpal tunnel

syndrome, status post left wrist surgery with incomplete recovery; cervical disc disease; chronic

lower back pain; fibromyalgia; and a previous abnormal MRI scan of uncertain etiology (Tr.

232). He suggested follow-up MRI scans and that Plaintiff limit her activities and stay off work

(Tr. 232).

In December 2003, Plaintiff returned to Dr. Awerbuch with complaints of generalized

myofascial pain, as well as pain, numbness, and tingling in her wrists and hands (Tr. 214). She

reported intermittent migraine headaches and ongoing back and leg pain (Tr. 214). Dr.

Awerbuch diagnosed bilateral carpal tunnel syndrome; lumbar herniated disc with bilateral

radiculopathies; fibromyalgia; obstructive sleep apnea; migraine headaches; leg swelling;

claudication; depression; and upper respiratory infection (Tr. 214). He ordered nerve conduction

- 6 -

studies of her upper limbs, which were indicative of bilateral carpal tunnel syndrome (Tr. 214, 216).

In January 2004, Larry G. Thompson, M.D., reviewed Plaintiff's records for the state agency (Tr. 183-90). Dr. Thompson opined that Plaintiff remained capable of performing work at the light exertional level (Tr. 184). She should never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl, and frequently balance (Tr. 185). She could occasionally handle with her left hand, and frequently handle with her right hand (Tr. 186). She should avoid concentrated exposure to vibration (Tr. 187).

In February 2004, Plaintiff saw Karen J. Clark, M.A., whose report was counter-signed by Ann L. Date, Psy.D. (Tr. 191-97). Plaintiff explained to Ms. Clark that she felt she was disabled based on fibromyalgia, carpal tunnel syndrome, bulging neck disc, scoliosis, right-handed numbness, daily headaches and irritable bowel syndrome (Tr. 191). Plaintiff reported that she could not concentrate and that she had no energy or enthusiasm (Tr. 193). Ms. Clark noted that Plaintiff had a depressed mood, weight gain, insomnia, fatigue, and loss of energy (Tr. 196). Ms. Clark diagnosed major depressive disorder and assigned a Global Assessment of Functioning (GAF) rating of 52 (Tr. 196).[1]

---

[1]The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed. 1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32. A GAF score of 31-40 indicates "some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id.* A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id.* A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

- 7 -

In February 2004, Julia A. Crowther, Ph.D., reviewed Plaintiff's records for the state agency (Tr. 198-206).  Dr. Crowther opined that Plaintiff had no restrictions of activities of daily living; no difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (Tr. 204). As for an RFC, Dr. Crowther opined that Plaintiff retained the ability to perform simple tasks on a sustained basis (Tr. 200).

In March 2004, Plaintiff returned to Dr. Awerbuch, with complaints of neck pain, shoulder, elbow pain, low back pain, and lower extremity pain (Tr. 207, 237-38). Dr. Awerbuch adjusted Plaintiff's medications and ordered a Doppler study of her lower limbs, which was negative (Tr. 207, 212-13). In September 2004, Plaintiff returned to Dr. Awerbuch with complaints of being depressed, stressed, nervous, upset, and unable to sleep (Tr. 266). She complained of pain in her neck, shoulders, arms, and hands; dizziness and blurred vision; legs buckling; intermittent migraine headaches; trouble with grasping objects; and waking up at night with numbness (Tr. 266). Plaintiff reported a lot of fatigue during the day (Tr. 266). Dr. Awerbuch ordered tests and advised Plaintiff to limit her home activities, follow home exercises, wear braces, and use a BIPAP machine with nasal pillows (Tr. 266).

In October 2004, Dr. Awerbuch noted that Plaintiff's Doppler study was normal (Tr. 264), her EEG was normal (Tr. 263) and that her cervical spine MRI scan revealed moderate degenerative disc disease and her lumbar spine MRI scan revealed mild degenerative disc disease and mild effacement (Tr. 260-62, 360-62). In December 2004, Plaintiff returned to Dr.

Awerbuch with continued complaints of depression and he prescribed Cymbalta (Tr. 259).

In March 2005, Plaintiff went to the emergency room with complaints of right upper and lower extremity numbness and tingling with weakness (Tr. 301-04). She saw Fatith Abbott, D.O., who noted that, although Plaintiff's physical examination was normal, she was subjectively reporting decreased sensation to both her right lower and upper extremities (Tr. 303). Dr. Abbott recommended a neurological examination (Tr. 303). A serum protein test (SPE) was normal (Tr. 294-95). A brain MRI scan revealed no acute intra cranial abnormality, but did note a non-specific right frontal white matter focus, most compatible with chronic small vessel ischemic change (Tr. 297). A cervical spine MRI scan revealed the development of lesions and a MRI scan revealed the possibility of a small right middle cerebral artery aneurysm (Tr. 298-99).

Plaintiff's aneurysm was "clipped" in March 2005 (Tr. 296, 316-28, 363). Post-surgical head CT scans revealed satisfactory post-operative appearance of the brain (Tr. 318). E. Malcom Field, M.D., reported that Plaintiff's neurosurgical care was completed and that Plaintiff had intact motor, sensory, and reflex function (Tr. 316). In April 2005, Dr. Field noted that Plaintiff was trying to get her strength back (Tr. 314). Dr. Field noted that Plaintiff "cared for some elderly ladies" and he felt that she could return to that work within the next four-to-six weeks (Tr. 315). In May 2005, Dr. Abbott noted that Plaintiff had excellent resolution of transverse myelitis with no residual deficits and good results from her aneurysmal clipping with no neurological deficits (Tr. 291-93). A May 2005 CT scan and lab tests failed to show any acute

- 9 -

abnormalities (Tr. 405, 412, 417-20). Later in May 2005, Plaintiff returned to Dr. Field, who noted that, other than swelling around the eye, Plaintiff was "doing really very well" (Tr. 314). Dr. Field encouraged Plaintiff to "be out and about and more active" (Tr. 314).

In June 2005, Plaintiff returned to Dr. Awerbuch, who noted that Plaintiff was recovering from aneurysm surgery (Tr. 256). She continued to complain of migraine headaches, neck pain, wrists and hand pain, low back pain, and diffuse fibromyalgia pain (Tr. 256). She complained of difficulty walking, bending, and twisting because her legs were "weak and numb" (Tr. 256). Nerve conduction tests of the lower limbs were normal (Tr. 258). Dr. Awerbuch administered trigger point injections in July 2005 (Tr. 254-55). A July 2005 CT brain scan revealed continued satisfactory post-operative appearance of the skull and brain (Tr. 313. 358). Plaintiff returned to Dr. Field in July 2005 with complaints of headaches (Tr. 312). Dr. Field could find nothing wrong (Tr. 312). In December 2005, Plaintiff underwent another brain CT, which did not find any residual or recurrent aneurysm (Tr. 310).

In February 2006, Plaintiff returned to Dr. Awerbuch with complaints of difficulty sleeping throughout the night (Tr. 253). He advised Plaintiff to undergo a sleep study (Tr. 253). The sleep study confirmed obstructive sleep apnea, sleep fragmentation, and poor sleep architecture (Tr. 251-52). Dr. Awerbuch recommended a CPAP machine (Tr. 252). In April 2006, Plaintiff returned to Dr. Field with complaints of discomfort of fullness of her right eye (Tr. 305, 308). Her CT scan was negative and her ECG was normal (Tr. 293, 306-07, 356-57, 392, 395). In June 2006, Plaintiff returned to Dr. Awerbuch with "a great deal of pain" (Tr. 336-37). She complained of right heel and foot pain; depression; trouble sleeping; day-time

fatigue; crepitation, swelling, weakness of her knees, and pain in her wrists and hands (Tr. 336).

Dr. Awerbuch advised Plaintiff to stay off work because she was unable to work "in any

capacity" due to her multiple orthopedic and neurologic problems, depression, and fatigue (Tr.

337). He recommended another sleep study (Tr. 337). The study resulted in a CPAP and Dr.

Awerbuch recommended that Plaintiff be monitored for compliance and effectiveness (Tr. 335).

In August 2006, Plaintiff underwent a GI series, which revealed mild chronic gastritis and reflux

esophagitis (Tr. 339-42).

     In August 2006, Connie Braun, M.D., opined that Plaintiff could lift frequently and

occasionally lift an amount less than ten pounds; stand/walk less than two hours; and sit

continuously less than six hours a day (Tr. 333). Dr. Braun stated that Plaintiff had these

restrictions "life long" (Tr. 333). In September 2006, Dr. Awerbuch issued the same opinion

(Tr. 334). Also in August 2006, Plaintiff returned to the emergency room with complaints of

chest pain (Tr. 366-71). Her objective test results were normal, including EKGs (Tr. 369, 375-

79). James Cogbill, M.D., noted that Plaintiff had a similar complaint in the past with normal

objective test results, including a cardiac catheterization in March 2005, which revealed

completely clean coronary arteries (Tr. 369). She was released in stable condition (Tr. 369).

### 3.    Medical expert testimony

     Walter W. Doren, M.D., testified at the hearing as a medical expert (Tr. 446-73). Dr.

Doren explained that he was an orthopedic surgeon as well as a hand surgeon (Tr. 37-38, 446).

Dr. Doren opined that, based on the medical record, Plaintiff's impairments did not meet or

equal a listed impairment (Tr. 448). After a summary of the evidence, Dr. Doren opined that

- 11 -

Plaintiff retained the ability for frequent handling (Tr. 461). He agreed with the state agency

reviewers that Plaintiff could perform light work because there was nothing in the medical

record that would limit her to more than a restriction to light work (Tr. 462). Dr. Doren noted

that Plaintiff's

complaints of low back pain and occasional lower extremity involvement were not consistent

with her MRI findings, which did not show any neurological impingement (Tr. 470).

### 4.    Vocational Expert

The ALJ posed a hypothetical question to Malcolm Brodzinsky, the vocational expert,

about an individual who had the same age, education, and past work history as Plaintiff (Tr.

479). This individual could perform light work with upper extremity limitations described as

being able to use her arms frequently, or between one-third and two-thirds of the day (Tr. 478-

79). The vocational expert identified unskilled jobs that such an individual could perform, such

as cashier (1.75 million jobs in the national economy) and officer helper (1.6 million national

jobs) (Tr. 479-80).

### B.    *Parties' Arguments*

### 1.    Plaintiff's Claims of Error

Plaintiff raises two issues on appeal, namely: (1) whether the Commissioner failed to

recognize all of the severe impairments Plaintiff suffers from; and (2) whether the Commissioner

formed an inaccurate hypothetical, which did not accurately portray all of Plaintiff's

impairments.  As to the first issue, Plaintiff argues that the ALJ should have found at step two

that Plaintiff also suffers from the severe impairments of fibromyalgia and depression.  In

support of this argument, Plaintiff points to the diagnoses made by Drs. Awerbuch and Date.

Plaintiff's second claim of error is related to the first – namely, Plaintiff contends that the ALJ

presented a hypothetical to the vocational expert which failed to account for all of Plaintiff's

impairments.

### 2.      Commissioner's counter-motion for summary judgment

The Commissioner responds to Plaintiff's first claim of error by arguing that the ALJ's

step two finding is not determinative of this case.  In particular, Defendant notes that the ALJ

found that Plaintiff had severe impairments sufficient to satisfy step two, thus the ALJ's failure

to find the additional severe impairments of fibromyalgia and depression are of no import.

Defendant further argues that substantial evidence supports the weight given to the

medical sources and supports the ALJ's credibility finding.  Specifically, Defendant points to the

evidence showing that Plaintiff has been gainfully employed after her alleged onset date.

Defendant notes that Plaintiff's earnings report suggests that Plaintiff is able to work in some

capacity and further notes that these posted earnings place doubt on Plaintiff's credibility, given

that Plaintiff testified that she has not worked since March 2002.

### III.     DISCUSSION

#### A.      *Standard of Review*

In enacting the social security system, Congress created a two-tiered system in which the

administrative agency handles claims, and the judiciary merely reviews the agency determination

for exceeding statutory authority or for being arbitrary and capricious.  *Sullivan v. Zebley*, 493

U.S. 521 (1990).  The administrative process itself is multifaceted in that a state agency makes

an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally

to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137 (1987). If relief is not found during this

administrative review process, the claimant may file an action in federal district court. *Id.*;

*Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative

decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the

court "must affirm the Commissioner's conclusions absent a determination that the

Commissioner has failed to apply the correct legal standard or has made findings of fact

unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d

591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In

deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de

novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499

F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of

course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses,

including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir.

2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required

to accept a claimant's subjective complaints and may...consider the credibility of a claimant

when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542

(6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great

weight, particularly since the ALJ is charged with observing the claimant's demeanor and

credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a

- 14 -

certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence.").

   If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g).  Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion."  *McClanahan v. Comm'r of Soc. Sec*., 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475.  "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts."  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted).

   The scope of this Court's review is limited to an examination of the record only.  *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs*., 974 F.2d 680, 683 (6th Cir. 1992).  There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record.  *Kornecky v. Comm'r of Soc. Sec*., 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks

- 15 -

omitted); *see also Van Der Maas v. Comm'r of Soc. Sec*., 198 Fed. Appx. 521, 526 (6th Cir. 2006).

### B.    Governing Law

#### 1.    Burden of proof

The "[c]laimant bears the burden of proving [her] entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs*., 46 F.3d 510, 512 (6th Cir. 1994); accord, *Bartyzel v. Comm'r of Soc. Sec*., 74 Fed. Appx. 515, 524 (6th Cir. 2003). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

- 16 -

*Carpenter v. Comm'r of Soc. Sec*., 2008 WL 4793424 (E.D. Mich. 2008), *citing*, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. If the analysis reaches the fifth step, the burden transfers to the Commissioner. *Combs v. Comm'r of Soc. Sec*., 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [her] RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

## 2.    Substantial evidence

If the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

## C.    *Analysis and Conclusions*

Plaintiff first argues that the ALJ erred in not finding that Plaintiff's depression and fibromyalgia constituted separate "severe impairments" at step two of his analysis, in addition to the bilateral carpel tunnel syndrome and mild degenerative disk disease which the ALJ did recognize as severe impairments. Plaintiff's argument is not well taken, as it is unnecessary to

- 17 -

decide such a question when the ALJ proceeded past step two and later fully evaluates Plaintiff's appropriate residual functional capacity.  *See Maziarz v. Sec. of HHS*, 837 F.2d 240, 244 (6th Cir. 1987).  Step two functions to decide whether to stop the analysis at that step, or move forward in the sequential evaluation process.  *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (step two is satisfied if the claimant has "any medical determinable physical or mental impairment.")  Here, the ALJ determined that Plaintiff had severe impairments of bilateral carpel tunnel syndrome and mild degenerative disk disease and moved on to step three of the analysis, thus there was no error by the ALJ at step two.

Plaintiff next argues that the ALJ erred by failing to give controlling weight to her treating physician's opinion regarding the limitations Plaintiff's ailments impose on her ability to work.  "Generally, the opinions of treating physicians are given substantial, if not controlling deference." *Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir.2004). A treating physician's opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see Cox v. Commissioner*, 295 F. App'x 27, 35 (6th Cir. 2008).  Furthermore, an opinion that is based on the claimant's reporting of her symptoms is not entitled to controlling weight.  *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Smith v. Commissioner*, 482 F.3d 873, 876-77 (6th Cir. 2007).

Here, the ALJ found that the opinions of Drs. Braun and Awerbuch (suggesting that Plaintiff be limited to sedentary work, with additional restrictions) were based upon Plaintiff's

- 18 -

subjective complaints and not based upon clinical findings.  As previously noted, the ALJ did

not find Plaintiff credible, contrasted with evidence indicating that she was indeed working.  An

ALJ's findings based on the credibility of an applicant are to be accorded great weight and

deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor

and credibility.  *Walters v. Comm'r of Soc. Sec*., 127 F.3d 525, 531 (6th Cir. 1997).  The

undersigned finds no reason to disturb the ALJ's credibility findings.

Plaintiff also argues that the hypothetical question posed to the vocational expert (VE)

was inadequate.  In particular, Plaintiff avers that the hypothetical failed to accurately portray

Plaintiff's impairments. However, a hypothetical question is not required to list the claimant's

medical conditions, but is only required to reflect the claimant's <u>limitations</u>. *Webb v.

Commissioner*, 368 F.3d 629, 633 (6th Cir. 2004). As discussed above, the ALJ found that

Plaintiff's was not fully credible – given that her earnings records showed posted earnings from

the Department of Health Home and given that Plaintiff's medical records revealed that she

worked "full time" "taking care of elderly ladies."

Additionally, the residual functional capacity circumscribes "the claimant's residual

abilities or what a claimant can do, not what maladies a claimant suffers from – though the

maladies will certainly inform the ALJ's conclusion about the claimant's abilities."  *Howard v.

Comm'r of Soc. Sec*., 276 F.3d 235, 240 (6th Cir. 2002).  "A claimant's severe impairment may

or may not affect his or her functional capacity to do work.  One does not necessarily establish

the other." *Yang v. Comm'r of Soc.* Sec., 2004 WL 1765480, *5 (E.D. Mich. 2004).  "The rule

that a hypothetical question must incorporate all of the claimant's physical and mental

- 19 -

limitations does not divest the ALJ of his or her obligation to assess credibility and determine the facts." *Redfield v. Comm'r of Soc. Sec.*, 366 F. Supp. 2d 489, 497 (E.D. Mich. 2005). The ALJ is only required to incorporate the limitations that he finds <u>credible</u>. *Casey*, 987 F.2d at 1235. This obligation to assess credibility extends to the claimant's subjective complaints such that the ALJ "can present a hypothetical to the VE on the basis of his own assessment if he reasonably deems the claimant's testimony to be inaccurate." *Jones*, 336 F.3d at 476. The ALJ's conclusion that Plaintiff has the residual functional capacity to preform light work is supported by substantial evidence, in particular evidence that Plaintiff is actually working "taking care of elderly ladies."

In sum, after review of the record, it appears that the decision of the ALJ is within that "zone of choice within which decision makers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## IV.   CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. 12) be **DENIED**, that Defendant's motion for summary judgment (Dkt. 15) be **GRANTED** and that the findings of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 10 days of service, as provided for in 28 U.S.C. § 636(b)(1) and Local Rule 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise

some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Within 10 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall not exceed 20 pages in length unless such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections by motion and order. If the Court determines any objections are without merit, it may rule without awaiting the response to the objections.

S/Mark A. Randon
Mark A. Randon
United States Magistrate Judge

Dated: August 5, 2009

<u>Certificate of Service</u>

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, August 5, 2009, by electronic and/or ordinary mail.

S/Melody Miles
Case Manager

- 21 -